ORDERED, ADJUDGED, and DECREED: that the United States Customs Service exclude the amounts paid for quota from transaction value and refund excess duties collected, plus interest, as provided by law.

IPSCO, INC. and Ipsco Steel, Inc., Plaintiffs,

v.

The UNITED STATES, Defendant,

and

Lone Star Steel Co., Defendant–Intervenor.

Court No. 88–05–00365.

United States Court of International Trade.

June 15, 1989.

Paul, Weiss, Rifkind, Wharton & Garrison (Robert E. Montgomery and George Kleinfeld), Washington, D.C., for plaintiffs.

Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, (Platte B. Moring, III), Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

Akin, Gump, Strauss, Hauer & Feld (Warren E. Connelly, Valerie A. Slater and Angela J. Paolini), Washington, D.C., for defendant-intervenor.

## OPINION

RESTANI, Judge:

Plaintiffs, Ipsco Inc. and Ipsco Steel Inc. (Ipsco), bring this action pursuant to Rule 56.1 of the Rules of this Court challenging an April 1988 determination of the United States Department of Commerce, International Trade Administration (ITA) clarifying the scope of certain antidumping and countervailing duty orders covering imports of oil country tubular goods (OCTG) from Canada. Public Record Document Number (PR) 66. In those orders, the scope of the investigations was said to cover:

> "oil country tubular goods" which are hollow steel products of circular cross-section *intended for use in drilling for oil and gas.* These products include oil well casing, tubing and drill pipe of carbon or alloy steel, whether welded or seamless, manufactured to either American Petroleum Institute (API) or non-API (such as proprietary) specifications....

> This investigation includes OCTG that are in both finished and unfinished condition.

51 Fed.Reg. 21,782, 21,783 (Jun. 16, 1986) (emphasis added).

The scope ruling at issue in this case was made following a June 30, 1987 request by Ipsco for a determination "that certain imports of steel pipe and hollow structural sections from IPSCO are not properly included within the scope of the antidumping or countervailing duty orders covering OCTG from Canada" because "[s]uch merchandise was used for water transmission or for the construction of foundations and was clearly not intended for use in drilling for oil and gas." PR 1. On July 28, 1987, Ipsco submitted to ITA a more detailed request specifically listing imports which Ipsco felt should be excluded from the orders and setting forth its rationale for seeking the exclusions. PR 3. In general, Ipsco indicated that the listed imports either possessed physical characteristics (*i.e.* were rectangular or built to non-standard sizes), or contained defects (*i.e.* were bent or had open (unwelded) seams), which made them unsuitable for OCTG use and that these imports, in fact, were not actually used as OCTG but were used "for plumbing, water transmission, water well casing, piling for building foundations, and structural support applications." *Id.* at 3.

After soliciting and receiving comments from interested parties, ITA issued a scope ruling on December 17, 1987, PR 32, in response to Ipsco's request. That ruling, which was found to contain certain errors, was rescinded shortly thereafter. Subsequently, ITA solicited additional information from interested parties and industry experts and on April 14, 1988 issued the corrected scope ruling which now is the subject of this action. In the challenged scope ruling ITA determined that:

> the scope of the orders includes API-specification OCTG and all other pipe with the following characteristics used in OCTG applications: length of at least 16 feet; outside diameter of standard sizes published in the API or proprietary specifications for OCTG, with tolerances of

plus ⅛ inch for diameters less than or equal to 8⅝ inches and plus ¼ inch for diameters greater than 8⅝ inches; minimum wall thickness as identified for a given outer diameter as published in the API or proprietary specifications for OCTG; and a minimum of 40000 PSI yield strength and a minimum of 60000 PSI tensile strength. Additionally, OCTG with seams includes only pipe using electric resistance welding technique. Furthermore, these orders include OCTG with non-standard size wall thickness greater than the minimum identified for a given outer diameter as published in the API or proprietary specifications for OCTG, with surface scabs or slivers, irregularly cut ends, ID or OD weld flash, or open seams. OCTG may be bent, flattened or oval, and may lack certification because the pipe has not been mechanically tested or has failed those tests. Further, we exclude pipe with any of the following characteristics: manufactured to non-circular shape, i.e. rectangular or square; less than 16 feet in length; less than 40000 PSI yield strength; less than 60000 PSI tensile strength; outside diameters outside API specifications; and if with seams, welded with other than the electric resistance technique.

PR 66. Recognizing that certain grades of non-OCTG pipe may meet the above-mentioned physical criteria, ITA instituted an end-use certification procedure. Under this procedure, Customs is instructed to suspend liquidation on all entries of pipe which meet the minimum criteria for OCTG and collect estimated antidumping/countervailing duties at the time of entry.[1] Duties, however, will be refunded to importers who can demonstrate with end-use certification or other conclusive evidence that the pipe was not actually used as OCTG by the ultimate consumer. *See* PR 65 at 6–7.

### ARGUMENT

Plaintiffs argument is twofold. First, plaintiffs assert that ITA's April scope ruling was not merely a clarification of the original scope determination, but rather, was an unlawful expansion of that determination. Plaintiffs' Brief at 4. Second, plaintiffs claim that the end-use certification process established in the scope ruling "is a sham which does not remedy the determination's legal defects," *id.* at 13, and that ITA "has failed to implement the certification process in good faith and has imposed arbitrary and unfair procedural hurdles to deny plaintiffs any relief." *Id.* at 15.

Defendant responds that the scope ruling simply clarifies and further defines an ambiguous phrase used in the original determination, namely, "intended for use in drilling for oil and gas," in order to aid enforcement of and ensure compliance with the antidumping and countervailing duty orders. Defendant's Brief at 11. Defendant also moves to strike page 15 through the first half of page 19 of plaintiffs' brief which contains plaintiffs' objections to ITA's implementation of the end-use certification procedure and an attachment thereto consisting of a letter from plaintiffs' counsel to ITA, dated January 19, 1989.[2] Defendant avers that in the cited pages and the attachment, "plaintiffs attempt to introduce matters concerning transactions occurring *after* the closing of the administrative record and the issuance of the scope determination, which is challenged in this action." Defendant's Motion to Strike at 1.

### DISCUSSION

The first issue before the court, simply stated, is whether ITA's April 1988 scope ruling was an expansion of the original

---

1. For entries of certain grades of line pipe whose physical specifications overlap with OCTG (grades X42, X46, X52, X56, X60, X65, X70 and X80) and which are specifically invoiced as line pipe, ITA instructed Customs to suspend liquidation but not to require a deposit of estimated antidumping/countervailing duties. As with other types of pipe, importers may submit evidence demonstrating that this line pipe is not being used as OCTG and if this is

established to ITA's satisfaction, the entries will be liquidated without duties. PR 65 at 6–7.

2. This letter was not, in fact, attached to the briefs submitted by plaintiffs to the court. As the letter clearly falls outside of the administrative record in this case, *see infra,* replacement copies were not requested.

scope determination or merely a clarification of that determination. According to plaintiffs, "the scope determination being challenged establishes such a broad set of physical criteria for the identification of OCTG that it in fact encompasses other types of pipe which were not intended for use in drilling for oil and gas—even though the final Commerce and International Trade Commission ("ITC") determinations were expressly limited to pipe which the importer intended for such drilling purposes." Plaintiffs' Brief at 2. Plaintiffs specifically challenge what they perceive as ITA's "inclusion of line and standard pipe within the OCTG orders." *Id.* at 12. Defendant responds that ITA "has not reached out and added any new products to the scope of the order[s]." Defendant's Brief at 9. Defendant denies that the scope ruling has resulted in the inclusion of line and standard pipe within the scope of the orders and asserts that "OCTG, which is defined as pipe possessing certain physical criteria, is the only product covered by the orders." *Id.* at 10.[3]

■ It is well established, and undisputed here, that ITA may not expand the scope of its antidumping and countervailing duty orders beyond the merchandise encompassed by the final less than fair value and subsidy determinations. *See, e.g., Royal Business Machines v. United States,* 1 CIT 80, 86–87, 507 F.Supp. 1007, 1013–14 (1980) *aff'd.* 669 F.2d 692 (C.C.P.A.1982). ITA, however, does have the authority to clarify and explain the scope of such orders. *See, e.g., Diversified Prods. Corp. v.*

*United States,* 6 CIT 155, 159, 572 F.Supp 883, 887 (1983).

At the center of this controversy is ITA's treatment of certain pipe which has been labelled by the manufacturer as a non-OCTG grade of pipe, e.g. line or standard grade, but which nonetheless meets the physical criteria selected by ITA to identify OCTG.[4] Plaintiffs argue that such pipe is not lawfully within the scope of the orders. According to plaintiffs:

The steel industry distinguishes different pipe products through stencils and other immutable markings on the pipe that attest to the industry-approved performance specifications which the pipe is designed to satisfy....

A manufacturer intending to produce OCTG will seek to attain the chemical composition and molecular structure of an OCTG grade of pipe, will test the product against various API OCTG performance requirements to insure that it will survive the stresses that it will encounter in OCTG applications, will certify this fact, *and will stencil or otherwise indelibly mark the end product as such.*

Plaintiffs' Brief at 7–8 (emphasis added). Reasoning that it "would be illogical for a manufacturer that wished to market pipe as OCTG to label it as generally less valuable line or standard pipe grade," plaintiffs argue that such stencilling or marking should be considered as conclusive evidence of the pipes' "intended use." *Id.*

Defendant disagrees and argues that because the stencilling or marking of pipe "is a voluntary practice which is not required

---

**3.** Plaintiffs argue that line and standard pipe may be distinguished from OCTG according to certain "class or kind" criteria set forth in *Diversified Prods. Corp. v. United States,* 6 CIT 155, 572 F.Supp. 883 (1983). The cited criteria, however, are used by ITA in determining whether new products belong to the class or kind of merchandise described in outstanding antidumping/countervailing duty orders. *See also Kyowa Gas Chem. Indus. Co. v. United States,* 7 CIT 138, 140, 582 F.Supp. 887, 889 (1984). This case does not involve new products. In any case, defendant does not argue that line and standard grade pipe are within the scope of the orders. Rather, defendant argues that pipe which possesses the physical characteristics of

*both* OCTG and a non-OCTG grade of pipe, *e.g.* line or standard grade, is OCTG for the purposes of this case and is included within the scope of the orders, unless an importer can demonstrate that the pipe was not actually used as OCTG.

**4.** In their Reply Brief at page 3, plaintiffs state:
[We have] never advocated the exclusion from the orders of unstencilled OCTG which is used for oil and gas drilling. Instead, our appeal seeks the exclusion of only that pipe which either *is* stencilled as line, standard, or other non-OCTG grades of pipe, or is unstencilled, but demonstrably was not sold for use, or actually used, as OCTG.

by the API or any other governmental or private authority, ... the labelling and marking of pipe as 'standard' or 'line' pipe [is] meaningless within the context of these orders." Defendant's Brief at 11. Defendant contends that pipe which possesses the physical characteristics of OCTG can be used as OCTG regardless of labels placed on the pipe and that such pipe is within the scope of the orders unless the end-user certifies to ITA that the pipe was not used as OCTG.

The court is not persuaded that ITA acted improperly in rejecting plaintiffs' contention that a pipe's stencil or marking should be regarded as conclusive evidence of the pipe's intended use when such stencilling or marking is a voluntary practice in the industry, PR 53, 54, 55, and when such pipe possesses all of the physical characteristics which would enable it to be used as OCTG. Although stencilling or marking may be strong evidence of what the manufacturer considers to be the product's intended use, such labelling does not necessarily reflect an importer or end-user's view of the product's intended use, nor does it prevent the pipe from actually being used as OCTG. As indicated in the record, a knowledgeable engineer may use for drilling purposes any pipe that meets the minimum requirements for OCTG. PR 53 at 2. Plaintiffs do not deny an overlap in physical characteristics between OCTG and other types of non-OCTG pipe or that pipe meeting the physical specifications for OCTG may be used as OCTG regardless of the stencil or marking placed on the pipe. ITA, therefore, acted reasonably in rejecting plaintiffs' suggested approach which would allow manufacturers and importers to evade the imposition of duties by simply labelling OCTG pipe as non-OCTG pipe sharing the same physical characteristics.

▌ Plaintiffs have also failed to convince the court that the physical criteria selected by ITA for identifying OCTG are in any way unreasonable or that the use of these criteria when combined with the end-use certification procedure results in an unlawful expansion of the scope of the antidumping and countervailing duty orders. In reaching this conclusion, the court notes the importance of the fact that ITA afforded plaintiffs full opportunity to assist the agency in selecting the relevant physical criteria.

After submitting their initial exclusion request, plaintiffs participated in discussions with officials at ITA and were advised of certain criteria that were being considered to distinguish OCTG from non-OCTG products. Plaintiffs were allowed to submit written objections to the proposed criteria, and did so on December 7, 1987. PR 27. In the submitted comments, plaintiffs proposed to ITA "three complementary means of amending its proposed physical criteria to achieve the result intended by the orders: (1) addition of a wall thickness criteria;[5] (2) exclusion of pipe identified by stencils as built to specifications for non-OCTG applications; and (3) exclusion of pipe certified by the actual end-user as used in non-OCTG applications." *Id.* at 7. Plaintiffs stated that unless ITA adopted these or other suitable amendments, the proposed physical criteria would "expand the orders' scope to encompass pipe intended, designed, manufactured and actually used in non-OCTG applications—a result neither envisaged by the orders nor legally permissible under the statutory guidelines and judicial precedent governing these proceedings." *Id.* at 7–8. As indicated in the scope ruling, ITA adopted two of these three proposed amendments. Only the stencilling criterium was not accepted. Plaintiffs did not propose any additional criteria which would allow ITA to more accurately distinguish OCTG from non-OCTG products.

---

**5.** With regard to the proposed wall thickness criteria, plaintiff stated:

> Unlike the other API specifications for OCTG, there is very little overlap between the wall thicknesses specified for OCTG versus line and plumbing pipe.... Only small quantities of non-OCTG pipe would filter into an order limited to pipe with API-spec OCTG wall thicknesses, and these could be excluded on the basis of other additional criteria outlined below.
>
> PR 27 at 6.

While the court is sympathetic to plaintiffs' legitimate concern that pipe actually used in non-OCTG applications not be included within the scope of the orders, that concern appears to be adequately addressed through ITA's end-use certification procedure, as that procedure is set forth in the administrative record under review.[6] ITA's use of this sort of procedural safeguard has previously been upheld by the court, *Mitsubishi Elec. Corp. v. United States*, 12 CIT ——, 700 F.Supp. 538, 559 (1988), *appeal docketed*, No. 89–1237 (Fed. Cir. Jan. 30, 1989), and is a reasonable extension of ITA's authority to clarify the scope of antidumping and countervailing duty orders.[7]

▪ The remaining issue before the court concerns plaintiffs' objections to the manner in which ITA has implemented the end-use certification procedure. Defendant argues that these arguments are not now properly before the court and has moved to strike page 15 through the first half of page 19 of plaintiffs' brief and a letter attached thereto, dated January 19, 1989, from plaintiffs' counsel to ITA.

Under the statute, the record for review is defined as:

(i) a copy of all information presented to or obtained by the Secretary, the administering authority, or the Commission *during the course of the administrative proceeding*, including all government memoranda pertaining to the case and the record of ex parte meetings required to be kept by section 1677f(a)(3) of this title; and

(ii) a copy of the determination, all transcripts or records of conferences or hearings, and all notices published in the Federal Register.

19 U.S.C. § 1516a(b)(2)(A) (1982) (emphasis added). The court has defined "during the course of the administrative proceeding" to be "during the particular review proceeding which results in the determination which is the subject of challenge." *Beker Indus. Corp. v. United States*, 7 CIT 313, 315, 1984 WL 3727 (1984).

In the present case, plaintiffs have made a motion for judgment upon the agency record challenging ITA's April 14, 1988 scope determination. Accordingly, the administrative record subject to review is limited to information which was before the agency at the time that determination was made. Information gathered by ITA following the scope determination relating to the administration of the certification procedure is not, therefore, part of the administrative record filed with this court.[8] As plaintiffs' arguments on page 15 through the first half of page 19 of its brief and the January 19, 1989 letter attached thereto relate entirely to events occurring during this subsequent period, the court grants defendant's motion to strike.[9]

---

6. The court does not presently decide whether or not ITA has implemented this procedure in a manner which achieves the intended result, *see infra*, only that, on its face, the procedure appears to be a reasonable means of ensuring that pipe which meets the physical criteria of OCTG but which is not actually used in OCTG applications is excluded from the orders.

7. In the administrative proceeding below, plaintiffs consistently argued in favor of an end-use certification procedure, PR 17, 25, 27, and stated that "[n]o more reliable means exists for establishing that pipe falls outside the orders own express limitations in scope." PR 27 at 7.

8. The court notes that there are limited circumstances in which the court may look beyond the administrative record, *e.g.*, when there has been a strong showing of bad faith or improper behavior on the part of the agency. *See Public Power Council v. Johnson*, 674 F.2d 791, 795 (9th Cir.1982) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)); *Armco, Inc. v. United States*, 13 CIT ——, 712 F.Supp. 214 (1989). Plaintiffs, however, have failed to make such a showing. ITA's alleged failure to provide adequate notice of its deadline for the submission of information relating to Ipsco's unliquidated 1986 and 1987 entries is not adequate evidence that ITA, at the time it made its scope determination, had no intention of applying the determination fairly. Moreover, any prejudice which plaintiffs may have suffered as a result of this alleged inadequate notice could have been challenged in the administrative review proceeding.

9. Plaintiffs claim that because they are not participating in the administrative review of the OCTG orders, they have "no other forum but this Court to expose the Department's end use certification procedure as a sham which has not yet excluded a single entry of IPSCO line, stan-

For the foregoing reasons judgment is entered in favor of defendant.

---

dard or other non-OCTG pipe." Plaintiffs' Reply Brief at 7. That plaintiffs have chosen not to participate in the administrative review does not alter the fact that information relating to ITA's

subsequent implementation of the end-use certification procedure is not a part of the administrative record in this case challenging the scope determination.